IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CULLIS ASSOCIATES, INC.
and FREDERICK R. CULLIS

V.                                    C.A. NO. 12-6833          **FILED**

CORTAPE NE, INC.                                                APR **2 5** 2014
d/b/a TAPEWORKS
                                                               **MICHAEL E. KUNZ**, Clerk
                                                               **By** _____ Dep. Clerk

MEMORANDUM OPINION

SCHMEHL, J.                                                    APRIL 24, 2014

Plaintiffs brought this breach of contract action, claiming the defendant breached an oral

agreement to pay plaintiffs royalties on the sales of a product called MachBloch for so long as

either the defendant's founder or president remained in control of the defendant. Defendant does

not dispute that the parties entered into a valid oral agreement, but contends that the agreement

was only to pay plaintiffs a sales commission on sales of MachBloch for so long as plaintiffs

pursued new customers and sales for MachBloc.  The case was tried to the Court, sitting without

a jury. The Court makes the following:

## FINDINGS OF FACT

1. From 1985 to 1991, plaintiff Frederick Cullis ("Cullis") worked for a company called

Fluorglas where he was the product manager for high performance tapes. (Tr. 7, 11). As the

product manager for Fluorglas, Cullis was responsible for selling tapes as well as for developing

new products. (Tr. 9). One of the new products that Fluorglas and Cullis tried to develop was a

tape that could be used as a masking tape for pressure, heat and abrasion during a process known

as high velocity oxy field. ("HVOF").  During Cullis' time at Fluorglas, he was unable to develop a tape that could withstand the pressure, heat and abrasion of the HVOF process. (Tr. 12).

2. While working as product manager at Fluorglas, Cullis developed a very strong business relationship with an individual named John Dusza ("Dusza"). (Tr. 9).

3. After Cullis left Fluorglas in 1991, he began to work for Chambers Associates, a manufacturing representative organization located in Princeton, New Jersey.  (Tr. 14, 106).

4. In 1991, Kenneth Chambers ("Chambers"), the President of Chambers Associates, was looking for someone to work with him for five years to learn his business and then to purchase his business in five years when Chambers would turn 65 and retire. (Tr. 14, 108).

5. In August of 1991, Cullis entered into a written agreement with Chambers Associates to work for and to purchase Chambers Associates in five years. (Tr. 49, 50, 66).

6. On August 1, 1996, Cullis purchased Chambers Associates and formed Cullis Associates. (Tr. 14, 15).

7. Defendant Cortape NE, Inc. d/b/a Tapeworks ("Tapeworks") is a corporation that purchases large rolls of tape for commercial and industrial use and makes smaller rolls of tape. It slit prints, dye cuts and laminates pressure sensitive adhesive tape for sale to distributors and end users. (Tr. 129).

8. Tapeworks was founded in 1985 by Chambers. (Tr. 118). Chambers testified that he was President of Tapeworks in name only and could not recall if he was ever the majority shareholder. (Tr. 118). Chambers was never involved in the day-to-day management and operations of Tapeworks. (Tr. 105). Chambers did not derive any income from the operation of Tapeworks.  (Tr. 105, 129, 130).

2

9. About a year and one half after Tapeworks was formed, Chambers installed his son-in-law, Randall Emmons ("Emmons"), as Vice-President and General Manager.[1] (Tr. 129, 130, 155). According to Emmons, Chambers' involvement with the operation of Tapeworks in the early to mid 1990s was solely as an advisor. (Tr. 132).

10. Emmons has served as President of Tapeworks for the last 14 to 18 years. (Tr. 129, 130).

11. While Cullis was employed by Chambers Associates, he was also an independent agent for Tapeworks, selling its product on commissions pursuant to an oral agreement. (Tr. 16).

12. When Cullis formed Cullis Associates in 1996, Cullis prepared a written sales representative agreement between Tapeworks and Cullis Associates, which was made retroactive to August 1, 1991, when Cullis first started with Chambers Associates. (Tr. 16; Exh. D-3).

13. In 1993, Cullis contacted Dusza, who now was responsible for sales at Jamak Fabrication ("Jamak") in Texas, as a possible source of additional revenue for Chambers Associates. Jamak manufactured and sold extruded and molded silicone rubber parts. (Tr. 17).

14. Chambers and Cullis agreed to represent Dusza and Dusza met with Chambers and Cullis offsite somewhere in the territory of Chambers Associates. (Tr. 20, 54). During the meeting, Dusza described Jamak's ability to make a compound out of uncured silicone rubber which could be molded into a certain place. (Tr. 19).

15. Cullis testified that "[a]nd when John [Dusza] described that capability, a lightbulb went off, because I know from my experience in business that silicone is a high temperature

---

[1] Emmons was dismissed as a defendant to this action upon motion at the close of plaintiff's case-in-chief. (Doc. 46).

3

abrasion resistant material. And when he described the ability to give us a compound that could be molded in place, and then cured, I though immediately of the HVOF application that I had never been able to find a tape for." (Tr. 19).

16. After Dusza returned to Texas, he sent Chambers Associates a sample of the uncured silicone rubber so that it could be tested in the HVOF application. (Tr. 20)

17. Cullis and Emmons tested the product in a number of locations, including at Metco in Long Island because Metco was the primary manufacturer of HVOF spray application equipment (Tr. 61-62). After the tests proved successful, Cullis and Chambers advised Dusza that the product appeared to work. (Tr. 21).

18. Chambers and Cullis flew to Texas to meet with Jamak principals. During the meeting with Jamak, R & D personnel mentioned a product they had developed which was an uncured silicone rubber which withstood high temperatures and was abrasion resistant. (Tr. 111. 112). Chambers testified that it was at this meeting that he, not Cullis, recognized the potential for Jamak's formulation. (Tr. 111-112).

19. Because Dusza and Jamak did not understand the market for the uncured silicone rubber, Jamak told Cullis that Jamak would offer to sell Chambers Associates an extruder to make the finished product and also sell the formulation material itself. (Tr. 22, 59).

20. Because Chambers Associates was a sales organization, not capable of actually manufacturing a product, Chambers suggested to Cullis that Tapeworks manufacture the product. (Tr. 23).

21. Cullis was hesitant to agree to this arrangement and told Chambers "well 10 or 15 years down the road, after Tapeworks has this product, and they buy the machine, and they buy

4

the equipment, and the product is known as a Tapeworks product, if for some reason they decide they don't want to pay anymore, I've got no standing in this product." (Tr. 23).

22. Cullis testified that Chambers then responded to his concern by stating, "well, if we take it through Tapeworks, then you will be paid a third of the profits on MachBloc no matter where we sell it." (Tr. 23).

23. Cullis testified that when he asked Chambers what would happen in the event Chambers retired and whoever was in charge of Tapeworks would cut Cullis out, Chambers responded that "as long as I and Emmons control Tapeworks, you will not be cut out of the profits on this product." (Tr. 68).

24. Cullis testified that at a subsequent meeting with Chambers and Emmons, Cullis told Emmons that Chambers had told him that "as long as you and Ken control Tapeworks, that I would get my share of the profits on MachBloch, do you understand that to be the case?" (Tr. 24).

25. According to Cullis, Emmons replied, "well, of course, who do you think I am Eric Akins?" "And he was referring to somebody that Chambers and Emmons had been in a lawsuit about. And the inference was, I get it, I understand, yes, you will get paid for your share."(Tr. 24).

26. Based on Emmons' assurance, Cullis arranged for Jamak to sell the extruder to Tapeworks as well as for Jamak to give Tapeworks the exclusive arrangement on the formulation of Jamak's uncured silicone rubber. (Tr. 25, 59).

27. After touring Jamak's facilities, Emmons purchased the extruder from Jamak and began manufacturing Jamak's uncured silicone rubber in tape form. (Tr. 135, 136). The process

5

involved taking the uncured rubber silicone product in block form from Jamak, putting it in the extruder, and converting it to another shape for use by the end user. The chemical composition of the product does not change during the process. (Tr. 56, 57).

28. Cullis suggested to Chambers and Emmons that they call the product MachBloc and Chambers and Emmons agreed. (Tr. 28).

29. Sales of MachBloc began in approximately 1993 or 1994. (Tr. 29).

30. MachBloc was sold directly through Tapeworks as well as through distributors. (Tr. 30). Cullis personally sold MachBloc and also assisted in packaging and advertising MachBloc. (Tr. 30, 74). Cullis also attended trade shows with Emmons and Chambers to promote MachBloc. (Tr. 29-30, 74, 75). Cullis was the only individual who sold MachBloc from the first sale until 2012. (Tr. 74). No one else employed by, or on behalf of Tapeworks, ever received a commission on the sales of MachBloc. (Tr. 141).

31. Chambers and Emmons understood the arrangement between Cullis and Tapeworks concerning the sale of MachBloc to be that Cullis would sell the product and be compensated on a commission basis as long as he continued to sell and promote the product. (Tr. 115, 160).

32. After Cullis formed Cullis Associates in 1996, Cullis prepared and entered into a written agreement with Tapeworks to sell non-MachBloc products for which Cullis Associates received a monthly check based on the sales Cullis actually made in his territory. (Tr. 33, 64-65; Exh. D-3). The written agreement was made retroactive to 1991 because up to 1996 there had only been on oral agreement between Tapeworks and Cullis for Cullis for the sale of non-MachBloc products. (Tr. 40). Cullis did not prepare any type of written agreement with Tapeworks for the sale of MachBloch.

6

33. The monthly check statements Cullis Associates received from Tapeworks contained two line items, one for the commissions Cullis Associates received for its sale of non-MachBloc products and one for the commissions Cullis Associates received for MachBloc. (Tr. 29; Exh. D-1, D-12). The term "royalty" was never used. Payments were made to Cullis Associates in this manner for the following 15 years. (Tr. 29).

34. Cullis originally received a commission from Tapeworks of 31.5% of gross profits on sales of MachBloc. (Tr. 140). According to Emmons, the commissions were to be paid as long as Cullis continued to actively pursue new business for the sales of MachBloc. (Tr. 140, 142). Cullis was not being paid on the basis that MachBloc was his idea. (Tr. 142).

35. There was never a written agreement between Tapeworks and Cullis regarding the sales of MachBloc. (Tr. 141).

36. In 2008, Cullis and Tapeworks entered into a written royalty agreement for the sale of another product called Lintstik. Despite being a party to a  written royalty agreement for the sale of Lintstik as well as a party to a written agreement with Tapeworks for the sale of non-MachBloc products, Cullis still did not put any agreement regarding the sale of MachBloc into writing. (Tr. 66).

37. Cullis admitted there was never any agreement between Cullis Associates and Tapeworks  that Cullis Associates would continue to get paid in the event Tapeworks sold the extruder, dye and idea for MachBloc to a third party. (Tr. 76).  Yet, the royalty agreement Cullis Associates had with Tapeworks for Lintstik specifically provided that the agreement could be assigned by Tapeworks without the consent of Cullis and Cullis would continue to be paid. (Exh. D-2 ).

7

38. Cullis admitted that he did not have the right to tell Tapeworks to "stop using the idea [Cullis] came up with, you can't sell MachBloc any longer." (Tr. 77).

39. Cullis admitted that he never used the term "royalty" in discussions with Chambers or Emmons during the mid-1990s. (Tr. 66-67).

40. In a letter dated January 8, 2008, Emmons memorialized a discussion he had with Cullis stating, inter alia, "The commission rate for MachBloc will be 15% [reduced from 31.5%] and Cullis and Associates will actively pursue increased sales from current and new customers." (Tr. 89, 143, Exh. D-4). According to Emmons, the new commission rate was for 15% of gross sales. (Tr. 143).

41.  Regarding this change, Cullis testified as follows:

> Q. This change was made by Mr. Emmons on behalf of
> Tapeworks, correct?
>
> A. At his request, yes.
>
> Q. You didn't agree with that?
>
> A. Well, it was less money. Why would I –I wasn't in favor of it, but I didn't have a lot of choice whether I could agree with it or not.
>
> Q. Why not? If you had an agreement for a royalty of 30 percent or 31 and a half percent, why didn't you have any authority to say no, you can't change it?
>
> A. He could win that battle and lose the war. He was also a principal for–Tapeworks. There was substantial compensation there, and in the total picture, I was better off accepting the new commission rate–the new remuneration rate and going forward. It was a business decision.
>
> Q. If [sic] there was no monetary benefit to you in terms of payments of–for sales of MachBloc, would you agree?
>
> A. No monetary benefit, no.

Q. In fact you lost money when it was changed?

A. Yes.

(Tr. 84.)

42. Cullis testified that at no time did he correct Emmons and tell him he was being paid a royalty and not a commission or that Cullis Associates did not have to pursue increased sales from current and new customers in order to be paid 15% for sales of MachBloc. (Tr. 89-90).

43. In a letter dated January 14, 2009, Emmons terminated Cullis from his position as a sales representative for Tapeworks for all products other than MachBloc because of declining sales efforts by Cullis Associates. (Tr. 90, 146, D-5). The letter further stated that "Cullis Associates will continue to be sole sales representative for Machbloc at the commission rate established last year of 15 percent." Cullis testified that he did not correct Emmons that he was being paid a royalty rather than a commission or that he did not have to make any sales of MachBloc in order to receive the commission.

44. The January 14, 2009 letter further stated that, "Of course, the royalty agreement for Lintstik remains in force." Cullis admitted that the letter made a distinction between the royalty Cullis was receiving for Lintstik and the commission he was receiving for MachBloc. (Tr. 91). In fact, Cullis admitted that he did not have a single letter, document or e-mail from Tapeworks concerning MachBloc in which the word "royalty" was mentioned. (Tr. 91).

45. Tapeworks provided a form 1099-MISC to Cullis and/or and Cullis Associates on a yearly basis, which listed all payments as "non-employee compensation" in block 7, and not as "royalties" in block 2. (Exh. D-13). In addition, all income received by Cullis Associates on the

9

sales of MachBloc was reported on its own income tax returns as regular income, and not as a royalty. (Tr. 95).

46. Tapeworks applied for a patent listing Chambers and Cullis as inventors of MachBloc, but the patent was not approved. The owner of the patent was listed on the application as Tapeworks, and not Cullis or Cullis Associates. (Tr. 62, 63, 142, 143).

47. At a meeting between Emmons and Cullis in March of 2012, Emmons asked Cullis why he should keep paying a commission to Cullis on the sales of MachBloc, because in Emmons' view, Cullis Associates was no longer actively selling MachBloc. (Tr. 92, 150). For the first time ever, Cullis suggested that he did not have to do anything in order to get a commission on the sales of MachBloc. (Tr. 92, 150).

48. Tapeworks terminated the agreement with Cullis Associates for the sale of MachBloc on April 16, 2012 because Cullis Associates had not been actively participating in the sales of MachBloc sales for one to two years. (Tr. 149; Exh. D-6).


The Court makes the following:

## CONCLUSIONS OF LAW

1. "The burden of proving the existence of a contract lies with the party relying on its existence." Edmondson v. Zetusky, 674 A.2d 760, 764 (Pa.Commw. Ct. 1996). "The elements of an enforceable contract under Pennsylvania law are: (1) a manifestation of an intent to be bound by the terms of the agreement, (2) sufficiently definite terms, and (3) an agreement supported by adequate consideration." Szymanski v. Sacchetta, No. Civ. A. 10-2336, 2012 WL 246249, at *4 (E.D. Pa. Jan. 26, 2012)(citation omitted).

10

2. The evidence supporting the existence of an oral contract must be "clear and concise." Luther v. Kia Motors Am., Inc., 676 F.Supp. 2d 408, 416 (W.D. Pa. 2009)(citing Martin v. Safeguard Scientifics, Inc., 17 F.Supp. 2d 357, 368 (E.D.Pa. 1998)); see also Feret v. First Union Corp., No.Civ.A. 97-6754, 1999 WL 80374, at *15 (E.D. Pa. Jan. 25, 1999).

3. In adducing intent, the goal is not the parties' subjective intent, but rather "the intent a reasonable person would apprehend in considering the parties' behavior." Am.Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 582 (3d Cir. 2009). Moreover, where an oral contract is involved, "courts must look to surrounding circumstances and course of dealing between the parties in order to ascertain their intent.'" Szymanski, 2012 WL 246249, at *4 (quoting Boyle v. Steiman,  631 A.2d 1025, 1033 (Pa. Super Ct. 1993)).

4. "The essential terms must be definite enough to provide a basis for enforcing the agreement." Waterford Mortg. Co. v. Integrated Alarm Servs. Grp., Inc., No.Civ.A. 06-3967, 2008 WL 4589630, at *3 (E.D.Pa. Oct. 14, 2008)(citation omitted). "If a court, due to indefiniteness or incompleteness, is unable to determine if a contract was performed, the court must find no contract existed in the first place." Reed v. Pittsburgh Bd. of Pub. Educ., 862 A.2d 131, 135 (Pa. Commw. Ct. 2004) (citing Restatement (Second) of Contracts § 33 cmt. c (1979)).

5. Defendant concedes that it entered into a valid oral agreement with Cullis Associates to pay Cullis Associates a sales commission on the sale of MachBloc for as long as Emmons or Chambers controlled Tapeworks and for as long as Cullis continued to actively promote and sale MachBloc.

6. Based on the above legal principles, the Court concludes that Tapeworks did not enter into a valid oral agreement to indefinitely pay Cullis Associates a royalty on the sale of

11

MachBloc even if Chambers or Emmons no longer controlled Tapeworks or if Cullis no longer actively promoted or sold MachBloc.

7. As support for the Court's conclusion, the Court examined the surrounding circumstances and course of conduct between Cullis Associates and Tapeworks and notes that:

a. when Cullis Associates and Tapeworks intended to enter into a royalty agreement, they specifically entered into a valid written royalty agreement as evidenced by the written royalty agreement for the sale of Lintstik. (D-2).

b. Cullis admitted that he never used the term "royalty" in discussions with Chambers or Emmons during the mid-1990s. (Tr. 66-67).

c. Cullis could not produce a single letter, document or e-mail between the parties concerning the sales of MachBloc in which the word "royalty" was mentioned. Rather, the word "commission" is always used. (Tr. 91; D-1, D-4, D-5, D-10, D-11, D-12, D-13).

d. Tapeworks provided a form 1099-MISC to Cullis and/or and Cullis Associates on a yearly basis, which listed all payments as "non-employee compensation" in block 7, and not as "royalties" in block 2. (Exh. D-13). In addition, all income received by Cullis Associates on the sale of MachBloc was reported on its own income tax returns as regular income, and not as a royalty. (Tr. 95).

e. Cullis admitted there was never any agreement between Cullis Associates and Tapeworks that Cullis would continue to get paid in the event Tapeworks sold the extruder, dye and idea for MachBloc to a third party. (Tr. 76). Yet, the royalty agreement Cullis Associates had with Tapeworks for Lintstik specifically provided that specifically provided that the agreement could be assigned by Tapeworks without the consent of Cullis and Cullis would

12

continue to be paid. (Exh. D-2).

 f. Cullis admitted that he did not have the right to tell Tapeworks to "stop using the idea [Cullis] came up with, you can't sell MachBloc any longer." (Tr. 77).

 g. When Emmons wrote to Cullis on January 8, 2008 that he was reducing the monthly payments to Cullis from 31.5% of gross profits to 15% of gross sales and stated that Cullis will actively pursue increased sales from current and new customers, Cullis did not object. If the parties had actually entered into a royalty agreement to indefinitely pay Cullis 31.5% of gross profits, Cullis would have had every right to object to Emmons unilaterally changing the agreement.

 h. The monthly check statements Cullis Associates received from Tapeworks contained two line items, one for the commissions Cullis Associates received for its sale of non-MachBloc products and one for the commissions Cullis Associates received for MachBloc. (Tr. 29; Exh. D-1, D-12). The term "royalty" was never used. Payments were made to Cullis Associates in this manner for the following 15 years. (Tr. 29).

 8. Judgment is ENTERED in favor of Defendant Coretape NE, Inc. d/b/aTapeworks and against plaintiff Frederick Cullis and Cullis Associates, Inc.